## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

GARY AND RITA WALLEN, Individually and On Behalf of All Others Similarly Situated,

      Plaintiffs,

v.

OPPENHEIMERFUNDS, INC.,
OPPENHEIMER FUNDS DISTRIBUTOR, INC.,
WILLIAM L. ARMSTRONG,
ROBERT G. AVIS,
GEORGE C. BOWEN,
EDWARD L. CAMERON,
JON S. FOSSEL,
SAM FREEDMAN,
BEVERLY L. HAMILTON,
ROBERT J. MALONE,
F. WILLIAM MARSHALL, JR.,
JOHN V. MURPHY,
BRIAN W. WIXTED, and
ANGELO MANIOUDAKIS,

      Defendants.

---

## CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF THE INVESTMENT COMPANY ACT OF 1940, STATE LAW
## AND JURY DEMAND

---

Plaintiffs Gary and Rita Wallen, for their Complaint, allege the following upon information and belief, based upon the investigation made by and through their attorneys, which included, *inter alia*, review of Securities and Exchange Commission ("SEC") filings, press releases, analyst reports, news articles, and other publicly available materials, including lawsuits prepared and filed in this jurisdiction and others.

## NATURE OF THE ACTION AND OVERVIEW

1.      Plaintiffs bring this class action on behalf of all persons or entities who held shares of any class of the Oppenheimer Champion Income Fund (the "Fund") as of December 9, 2008. The Fund sold five classes of shares, A, B, C, N, and Y, under the ticker symbols OPCHX, OCHBX, OCHCX, OCHNX, and OCHYX.

2.      The action is brought against the Fund, and affiliated entities, for deviating from the Fund's fundamental investment objectives and self-imposed borrowing limitations. Section 8 of the Investment Company Act of 1940 (the "ICA") directs an investment company to recite in its Registration Statement "all investment policies of the registrant ..., which are changeable only if authorized by shareholder vote," as well as all policies that "the registrant deems matters of fundamental policy." 15 U.S.C. § 80a-8(b) (2) & (3). Section 13 prohibits a registered investment company from deviating from any such policies "unless authorized by the vote of a majority of its outstanding voting securities." 15 U.S.C. § 80a-13.

3.      In Registration Statements and Prospectuses, Defendants agreed that the Fund's fundamental policies could be changed "by the vote of a 'majority' of the Fund's outstanding voting securities." *See*, *e.g.*, January 26, 2007, Statement of Additional Information.

4.      As part of those policies, Defendants stated that the Fund was prohibited from investing 25% or more of its total assets in any one industry, could not borrow money in excess

of 33 1/3% of the value of its total assets, and would invest in a "diversified portfolio" of high-yield, lower-grade, fixed-income securities that do "not involve undue risk."

5.      Contrary to these fundamental policies, beginning in late 2006, the Fund concentrated more than 25% of its total assets in high-risk mortgage-backed securities, utilized substantial and risky leveraging devices that resulted in borrowings well in excess of 33 1/3% of the value of its total assets, heavily employed risky total-return swaps and credit-default swaps, and otherwise invested in securities with undue risk.

6.      At no time did the Trustees seek or obtain approval from a majority of the Fund's shareholders to deviate from the foregoing fundamental policies.

7.      These violations of fundamental policies resulted in the loss of hundreds-of-millions of dollars. The Fund's assets as of September 20, 2007 were over $2.5 billion. This dropped to just over $2 billion on March 31, 2008, and then plunged to $638 million on December 31, 2008, an almost $2 billion drop in assets in 15 months' time.

8.      The Fund experienced an 82% drop in NAV, one of the worst showings among the roughly 150 U.S. high-yield debt funds.

## JURISDICTION & VENUE

9.      Plaintiffs bring claims under and pursuant to § 44 of the Investment Company Act of 1940 (15 U.S.C. § 80a-43), 28 U.S.C. §§ 1331, 1332(d)(2), and 1367.

10.      Venue is proper in this District pursuant to 28 U.S.C. 139l(b). Defendants do business in this District. Further, many of the acts giving rise to the violations of law complained of herein occurred in this District, including manager meetings, the preparation and dissemination to shareholders of the Registration Statements and Prospectuses, and the decision to deviate from the Fund's fundamental policies without first obtaining shareholder approval.

The Fund has its Principal Executive Offices in this District at 6803 South Tucson Way, Centennial, Colorado 80112-3924.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

12.     Plaintiffs Gary and Rita Wallen held 35,522 shares of the Fund as of December 9, 2008 and have suffered losses as a result of Defendants' conduct alleged herein.

13.     The Defendants are all affiliated with each other and conduct business under the umbrella of the "Oppenheimer" name, which is one of the largest asset management organizations in the United States.

14.     The Defendants are all affiliated with each other and conduct business under the umbrella of the "Oppenheimer" name, which is one of the largest asset management organizations in the United States.

15.     Defendant OppenheimerFunds, Inc. (the "Manager") is the manager and investment advisor of the Fund and chooses the Fund's investments and handles its day-to-day business. It is a holding company that engaged in securities brokerage, banking services and related financial services through its subsidiaries. OppenheimerFunds, Inc. is incorporated and headquartered in Colorado at 6803 South Tuscon Way, Centennial CO 80112. The Manager carries out its duties, subject to the policies established by the Fund's Board of Trustees, under an investment advisory agreement. As compensation for its services, OppenheimerFunds, Inc. receives a management fee.

16.     Defendant OppenheimerFunds Distributor, Inc. (the "Distributor") is a subsidiary of the Manager and was the principal underwriter and distributor for shares of the Fund, was the trust agent for the purpose of the continuous public offering of the Fund's shares, and helped draft and disseminate the offering documents.

17.     Defendant William L. Armstrong is Chairman of the board of Trustees and signed or authorized the signing of each Registration Statement.

18.     Defendant Robert G. Avis was a Trustee and signed or authorized the signing of the January 26, 2007 Registration Statement.

19.     Defendant George C. Bowen is a Trustee and signed or authorized the signing of each Registration Statement.

20.     Defendant Edward L. Cameron is a Trustee and signed or authorized the signing of each Registration Statement.

21.     Defendant Jon S. Fossel is a Trustee and signed or authorized the signing of each Registration Statement.

22.     Defendant Sam Freedman is a Trustee and signed or authorized the signing of each Registration Statement.

23.     Defendant Beverly L. Hamilton is a Trustee and signed or authorized the signing of each Registration Statement.

24.     Defendant Robert J. Malone is a Trustee and signed or authorized the signing of each Registration Statement.

25.     Defendant F. William Marshall, Jr., is a Trustee and signed or authorized the signing of each Registration Statement.

26.     Defendant John V. Murphy is President and Principal Executive Officer of the

Fund and a Trustee and signed or authorized the signing of each Registration Statement.

27.     Defendant Brian W. Wixted is Treasurer and Principal Financial and Accounting Officer of the Fund and signed or authorized the signing of each Registration Statement.

28.     Defendant Angelo Manioudakis was the Fund's Vice President and Portfolio Manager until his departure in December 2008.

29.     The persons identified above in ¶¶ 17-28 sometimes are referred to as the "Individual Defendants."

30.     The Manager, the Distributor, and the Individual Defendants, directly or indirectly, control the Fund, both individually and collectively.

## FACTUAL ALLEGATIONS

31.     The Fund is an open-ended, fixed income mutual fund managed and marketed by Defendant OppenheimerFunds. The Fund sold five classes of shares, A, B, C, N, and Y, under the ticker symbols OPCHX, OCHBX, OCHCX, OCHNX, and OCHYX.

32.     Defendants annually filed nearly identical Registration Statements and Prospectuses in connection with the continuous offerings of the Fund's shares. The Fund's shares were issued to investors pursuant to the following series of Registration Statements filed with the SEC, which are referred to collectively as the "Registration Statements":

- Registration Statement filed pursuant to Form N-1A on August 7, 2006;

- Registration Statement filed pursuant to Form N-1A on January 26, 2007; and

- Registration Statement filed pursuant to Form N-1A on January 28, 2008.

33.     The Fund was marketed and sold to investors pursuant to the following series of Prospectuses:

- Prospectus dated August 7, 2006 (the "2006 Prospectus");

- Prospectus dated January 26, 2007 (the "2007 Prospectus"); and

- Prospectus dated January 28, 2008 (the "2008 Prospectus").

34.     These Prospectuses also explicitly incorporated by reference a Statement of Additional Information ("SAI") and the Fund's Annual Report for that year, each of which provided investors with additional guidance about, *inter alia*, the Fund's investment strategies and limitations. These SAIs include the following:

- Statement of Additional Information dated August 7, 2006;

- Statement of Additional Information dated January 26, 2007; and

- Statement of Additional Information dated January 28, 2008;

35.     From the August 7, 2006, Registration Statement and Prospectus onward, Defendants issued and offered for sale shares of the Fund. Defendants continuously filed nearly identical Registration Statements and Prospectuses and continued to offer and sell the Fund's newly issued securities.

36.     The Registration Statements, Prospectuses, and SAIs used to register and offer the Fund to Plaintiffs and the Class contained the following statements about the Fund's investment policies, risk levels, and other material information to investors:

a.      From the August 7, 2006 Prospectus:

WHAT ARE THE FUND'S INVESTMENT OBJECTIVES? The Fund's primary objective is to seek a high level of current income by investing mainly in a diversified portfolio of high-yield, lower-grade, fixed-income securities that **the Fund's investment manager, OppenheimerFunds, Inc. (the "Manager"), believes do not involve undue risk.** The Fund's secondary objective is to seek capital growth when consistent with its primary objective.

WHAT DOES THE FUND MAINLY INVEST IN? The Fund invests mainly in a variety of high-yield fixed-income debt securities of domestic

and foreign issuers for high current income. These securities primarily include:

- Lower-grade bonds and notes of corporate issuers.
- Foreign corporate and government bonds.
- "Structured" notes.

Under normal market conditions, the Fund invests at least 60% of its total assets in high-yield, lower-grade, fixed-income securities, commonly called "junk" bonds. Lower-grade debt securities are those rated below "Baa" by Moody's Investors Service ("Moody's") or lower than "BBB" by Standard & Poor's Ratings Service ("S&P") or comparable ratings by other nationally-recognized rating organizations (or, in the case of unrated securities, determined by the Manager to be comparable to securities rated below investment grade). See Appendix A to the Statement of Additional Information for a description of bond ratings.

The remainder of the Fund's assets may be held in other debt securities, cash or cash equivalents, or invested in rights or warrants, or invested in common stocks and other equity securities when the Manager believes these investments are consistent with the Fund's objectives. Investments in high-yield securities and equity securities may provide opportunities for capital growth while also providing income to the Fund.

The Fund's foreign investments currently focus on debt securities of issuers in developed markets. The Fund also uses certain derivative investments, primarily "structured notes," to try to enhance income or to try to manage investment risks. These investments are more fully explained in "About the Fund's Investments," below.

HOW DO THE PORTFOLIO MANAGERS DECIDE WHAT SECURITIES TO BUY OR SELL? In selecting securities for the Fund, the Fund's portfolio managers analyze the overall investment opportunities and risks in different market sectors, industries and countries. **The overall strategy is to build a broadly diversified portfolio of debt securities to help moderate the special risks of investing in high-yield debt instruments.** The portfolio managers currently use a "bottom up" approach, focusing on the performance of individual securities before considering industry trends. They evaluate an issuer's liquidity, financial strength and earnings power and also consider the factors below (which may vary in particular cases and may change over time), looking for:

- Changes in the business cycle that might affect corporate profits,

- Corporate sectors that in the portfolio managers' views are currently undervalued in the marketplace,
- Issuers with earnings growth rates that are faster than the growth rate of the overall economy,
- Securities or sectors that will help the overall diversification of the portfolio, and
- Issuers with improvements in relative cash flows and liquidity to help them meet their obligations.

The portfolio managers monitor changes in the factors listed above and any changes may trigger a decision to sell a security.

WHO IS THE FUND DESIGNED FOR? The Fund is designed primarily for investors seeking high current income from a fund that invests mainly in lower-grade domestic and foreign fixed-income debt securities. Those investors should be willing to assume the greater risks of short-term share price fluctuations that are typical for a fund that invests mainly in high-yield domestic and foreign fixed-income debt securities, which also have special credit risks. Since the Fund's income level will fluctuate, it is not designed for investor needing an assured level of current income. The Fund is intended to be a long-term investment and may be appropriate as a part of a retirement plan portfolio. The Fund is not a complete investment program.

b.  The January 26, 2007, and January 28, 2008, Prospectuses contained

information similar to the 2006 Prospectus:

WHAT ARE THE FUND'S INVESTMENT OBJECTIVES? The Fund's primary objective is to seek a high level of current income by investing mainly in a diversified portfolio of high-yield, lower-grade, fixed-income securities that **the Fund's investment manager, OppenheimerFunds, Inc. (the "Manager"), believes does not involve undue risk.** The Fund's secondary objective is to seek capital growth when consistent with its primary objective.

WHAT DOES THE FUND MAINLY INVEST IN? The Fund invests in a variety of high-yield, fixed-income securities and related instruments. These investments primarily include:

- Lower-grade corporate bonds.
- Foreign corporate and government bonds.
- Swaps, including single name and index-linked credit default swaps.

Under normal market conditions, the Fund invests at least 60% of its total assets in high-yield, lower-grade, fixed-income securities, commonly called "junk" bonds. Lower-grade debt securities are those rated below "Baa" by Moody's Investors Service ("Moody's") or lower than "BBB" by Standard & Poors Ratings Service ("S&P") or comparable ratings by other nationally-recognized rating organizations (or, if unrated, debt securities determined by the Manager to be comparable to securities rated below investment grade). See Appendix A to the Statement of Additional Information for a description of bond ratings. Investments in high-yield securities may provide opportunities for capital growth while also providing income to the Fund.

The remainder of the Fund's assets may be invested in other debt securities, common stocks (and other equity securities), or cash equivalents when the Manager believes these investments are consistent with the Fund's objectives.

The Fund may invest in securities of foreign issuers. The Fund currently focuses on debt securities of foreign issuers in developed markets. The Fund also uses certain derivative investments to try to enhance income or to try to manage investment risks. These investments are more fully explained in "About the Fund's Investments," below.

HOW DO THE PORTFOLIO MANAGERS DECIDE WHAT SECURITIES TO BUY OR SELL? In selecting securities for the Fund, **the overall strategy is to build a broadly diversified portfolio to help moderate the special risks of investing in high-yield debt instruments.** The portfolio managers currently use a "bottom up" approach, focusing on the performance of individual securities before considering industry trends. They evaluate an issuer's liquidity, financial strength and earnings power. The Fund's portfolio managers also analyze the overall investment opportunities and risks in different market sectors, industries and countries. The Fund's portfolio managers consider some or all of the factors below (which may change over time):

- Issuers with earnings growth rates that are faster than the growth rate of the overall economy,
- Issuers with improvements in relative cash flows and liquidity to help them meet their obligations,
- Corporate sectors that in the portfolio managers' views are currently undervalued in the marketplace,
- Changes in the business cycle that might affect corporate profits, and
- Securities or sectors that will help the overall diversification of the portfolio.

The portfolio managers monitor changes in the factors listed above. Any changes may trigger a decision to sell a security.

WHO IS THE FUND DESIGNED FOR? The Fund is designed primarily for investors seeking high current income from a fund that invests mainly in lower-grade domestic and foreign fixed-income securities. Those investors should be willing to assume the greater risks of short-term share price fluctuations and the special credit risks that are typical for a fund that invests mainly in lower-grade domestic and foreign fixed-income securities. Since the Fund's income level will fluctuate, it is not designed for investor needing an assured level of current income. The Fund is intended to be a long-term investment and may be appropriate as a part of a retirement plan portfolio. The Fund is not a complete investment program.

37.     On December 2, 2008, the Fund filed with the SEC its 2008 Annual Report for fiscal year ending September 31, 2008 on Form N-CSR. The Annual Report provided additional details as to the extent of the Fund's derivative exposure and leverage position and further disclosed the Fund's purchase of Lehman bonds during its fourth quarter. The Annual Report provided in part:

> **Management's Discussion of Fund Performance**. For the 12-month period ended September 30, 2008, the Fund's Class A shares (without sales) returned -27.70%, underperforming the Merrill Lynch High Yield Master Index and the Lehman Brothers Credit Index, which returned -11.58% and -4.79%, respectively, during the same time frame.

> **For the fiscal year ended September 30, 2008, several factors detracted from Oppenheimer Champion Income Fund's returns and materially contributed to the Fund's underperformance versus its benchmarks. To begin, our decision to gradually improve the overall credit quality of the Fund's portfolio hurt us. In the beginning of the fiscal year, high-yield credit spreads were "tight," or narrow relative to like-duration Treasuries. At that time, we believed that the high-yield market was not adequately compensating investors for taking on incremental risk. Given this conviction, plus our unwavering commitment to avoid undue risk, we began trimming our high-yield risk exposure and instead, worked to increase our exposure to higher-quality credits. We accomplished this by adding to the portfolio's higher-grade, longer-duration financials bonds, highly rated non-agency residential mortgages and equally highly rated commercial mortgage-backed securities.**

**Despite the fact that the overall credit quality of our holdings improved, this strategy worked against us. For one, the ongoing credit crisis propelled investors to eschew virtually all mortgage-related risk, regardless of credit quality, compressing returns in the residential non-agency mortgage arena—even for securities backed by high-quality borrowers with AAA-ratings.**

**Additionally, our decision to emphasize financial bonds of longer durations hurt us in two respects: financial-related credit suffered substantially by association as some of Wall Street's major banking institutions declared or neared bankruptcy; and, longer-maturity bonds weathered relatively greater price volatility in an increasingly turbulent market. Finally, although commercial mortgage-backed securities (CMBS) bear little resemblance to residential mortgage-backed securities in terms of current delinquencies and potential for impairment, they too were shunned by investors due to perceived association with the residential mortgage crisis. And, despite a brief rally for CMBS in the second quarter 2008, they soon fell and lagged markedly for the period at large. With all three of these market segments sharply underperforming, our emphasis in these areas placed a substantial drag on Fund performance.**

Next, our decision to underweight our exposure to high-yield credits also cost us returns. Ironically, despite a widespread flight-to-quality by investors who turned away from perceived risk, lower-quality, high-yield credit suffered less on a relative basis than some higher-quality names, largely due to sector association.

Finally, our interest-rate positioning detracted from performance, but only slightly. We remained neutral in our duration, or interest-rate sensitivity, based on our belief that the market's expectations for rates during the period were roughly in line with actual economic fundamentals. Fortunately, this strategy only minimally impacted returns for the Fund.

Notwithstanding the Fund's disappointing performance this period, three factors worked in our favor. Our decision to remain underweighted in our exposure to both retail/consumer credit as well as cyclical names, such as metals, mining and paper company debt, helped, since these areas lagged. Similarly, our overweight exposure to specialty chemicals at the expense of commodity chemicals also added to our returns, since this niche of the credit market exhibited relatively less sensitivity to current conditions.

38.     On December 10, 2008, *Bloomberg* published an article entitled "Oppenheimer High-Yield Fund Battered by Mortgage-Backed Debt". The article stated in part:

**Oppenheimer Champion Income Fund fell 55 percent in the past month after the U.S. Treasury abandoned plans to buy troubled mortgages from banks, making it the worst-performing U.S. bond fund since September.**

**The $627 million high-yield fund, run by New York-based OppenheimerFunds Inc., plunged on wrong-way bets that prices on securities tied to commercial mortgages would increase. Instead, prices fell after Treasury Secretary Henry Paulson said Nov. 12 that the government's $700 billion economic-rescue program wouldn't include buying toxic debt as first planned.**

"I don't think the managers saw it as an aggressive strategy, **but there were some risks there that weren't clearly appreciated,"** said Miriam Sjoblom, a fund analyst with Morningstar Inc. in Chicago. "The big question right now is: Will the fund recover quickly, or will it take years?"

Top-rated commercial-mortgage bonds, the largest part of the $800 billion market, tumbled 10 percent last month, according to Merrill Lynch & Co.'s CMBS Fixed-Rate AAA Rated index. That compares with an 8.5 percent drop in October, the previous worst decline since at least 1998.

The spread on AAA rated commercial mortgage-backed securities hit a record 15.29 percentage points more than benchmark rates on Nov. 20, according to Bank of America Corp. data. The gap has since fallen to 10.17 percentage points.

Corporate Investment

**Managed by a five-member team led by Angelo Manioudakis, Champion Income has lost 77 percent since September, the biggest decline by any bond fund tracked by Morningstar. OppenheimerFunds has pumped $150 million into the fund so the fund does not have the sell illiquid securities, Manioudakis said in an interview.**

"It was the perfect storm," he said. "Traditional high- yields were experiencing a decline in prices and spreads" on commercial-backed mortgage securities "widened to unprecedented levels."

OppenheimerFunds, owned by Massachusetts Mutual Life Insurance Co., manages more than $150 billion.

Champion Income can invest as much as 40 percent of assets in areas where it sees "strong opportunity," according to fund marketing documents. The fund's prospectus allows the managers to invest in swaps

and other derivatives. The total-return swap contracts held by Champion Income that were backed by commercial mortgages had a notional value of $1.05 billion as of Sept. 30, according to a Dec. 2 regulatory filing.

Under those swaps, the fund would have profited if the spread, or the difference between benchmark interest rates and mortgage-backed bonds, had narrowed. Instead, mortgage bonds posted a record decline in November, raising the gap to an all- time high.

'Ridiculous Levels'

Manioudakis said declines in the market for mortgage-backed securities has brought prices for senior debt to "ridiculous levels," which will help the fund when prices rebound.

Oppenheimer Champion Income entered into total-return swaps with counterparties including Goldman Sachs Group Inc. and Citigroup Inc. as of Sept. 30.

According to the terms of those agreements, if credit spreads rose on certain indexes of commercial mortgage-backed securities, the fund would pay the counterparties the spread plus as much as 2.5 percent of the notional value of the bonds.

Commercial mortgage delinquencies rose in November and will climb as the economy slows, according to Barclays Plc. Payments more than 60 days late on commercial real estate loans that were bundled together and sold as bonds increased to 0.69 percent last month, compared with 0.57 percent in October and 0.51 percent in September, Barclays data show.

High-Yield Fall

High-yield bond funds that invest in corporate debt have tumbled 31 percent this year after a credit freeze that started last year with a surge in subprime-mortgage defaults. The bankruptcy in September of Lehman Brothers Holdings Inc. accelerated bond-market declines, with investors shunning all but the safest government-backed debt.

High-yield, or junk, bonds are rated below Baa3 by Moody's Investors Service and less than BBB- at Standard & Poor's.

Companies with junk credit ratings have been mostly unable to sell bonds, causing yields over benchmark rates on their debt to double since Lehman filed for bankruptcy to more than 20 percentage points for the first time, according Merrill Lynch index data.

> **Oppenheimer Champion fund had about 61 percent of assets in corporate debt rated "B" or below by Standard & Poor's. That compares with 79 percent of assets held in debt rated below "B" by rival high-yield bond funds, according to Morningstar.**
>
> **Even with higher-quality investments, the swap arrangements dragged down the Oppenheimer fund, Morningstar's Sjoblom said. The average high-yield bond fund has declined 29 percent in the past three months, Morningstar data show.**
>
> Champion Income has lost 79.1 percent this year, a record eclipsed only by Regions Morgan Keegan Select High Income Fund. That fund, managed by Memphis, Tennessee-based Morgan Asset Management Inc., has declined 79.2 percent on below-investment- grade bonds. The performance has prompted investor lawsuits. Morgan Asset Management is the investment advisory unit of Regions Financial Corp., based in Birmingham, Alabama.

39.     On December 10, 2008, the Fund closed at $1.67 per share, a decline of 83% from a high of $9.71 per share in May 2007.

40.     In late 2006 or in 2007, and unbeknownst to investors, the Fund altered investment policies by dramatically increasing the Fund's reliance on volatile mortgage-backed securities and risky derivative instruments, in contravention of their stated investment policy. Although the Fund had invested in derivatives prior to this change in course, it had done so more conservatively in an effort to hedge risk and not to goose returns. The Fund became a *de facto* hedge fund, investing heavily in extraordinarily risky derivatives that were highly illiquid.

41.     The Fund traded in several types of "derivative" assets, including total-return swaps, which are highly illiquid, speculative and complex agreements between parties to exchange cash flows in the future based on how a set of securities performs. As commercial mortgage-backed securities cratered in 2008, the Fund suffered substantial losses. Another example of "derivative" CDSs are essentially insurance contracts that protect investors against bond and loan defaults. In exchange for being on the hook to pay out for such issues, CDS sellers

receive a stream of interest payments. Selling CDSs can be particularly risky when insuring companies that are already struggling with credit problems – which is exactly what the Fund did. Through September 2008, the Fund was selling CDSs on troubled companies like Lehman Brothers, AIG, General Motors, and Tribune Company – all companies that have either collapsed, filed for bankruptcy or were otherwise in crisis in 2008. And the troubles at these companies were already public in September 2008, meaning that the Fund knowingly made these investments. The Fund's losses on selling CDSs were massive.

42.     The Fund also magnified risk by, in effect, doubling down on falling mortgage-related bonds in 2008. For example, mortgage securities tied to Washington Mutual Inc. with a $9 million principal value were valued at only $3 million at the end of September 2008. A set of five Freddie Mac mortgage-backed securities with a combined principal amount of $20 million were valued at just $2.5 million. As defaults continued to rise, the mortgage related holdings plummeted.

43.     *On February 6, 2009, Morningstar gave the Fund an "F" for "failing investors," noting that "the managers bought complex, off-balance-sheet swap contracts that created a leveraging effect" and that "no attempt was made to communicate to shareholders that these funds were taking on additional risk."*

44.     On February 4, 2009, *Morningstar* included the Fund on its list of "The Eight Most Shocking Losses of the Past 12 Months," noting that "the managers tried to make a killing in mortgages by scooping them up at depressed prices in January 2008," which was *"[n]ot only . . . a really bad bet, but it was made much worse by the use of tremendous leverage. [I]t wasn't easy for shareholders to see that their fund had just become much more risky."* In another article dated February 5, 2009, *Morningstar* stated that Oppenheimer "did a terrible job

communicating the risks of this exposure in shareholder reports and Web commentary."

## CLASS ACTION ALLEGATIONS

45.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who held shares of the Fund as of December 9, 2008, who were damaged thereby.

46.     Excluded from Class are Defendants, their Officers and Directors, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

47.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands if not tens-of-thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Registrant or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in class actions.

48.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

49.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action litigation.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.       Whether the Fund deviated from an investment objective that could only be changed by a shareholder vote;

b.       Whether the Fund invested in securities that were of greater risk than provided for in its investment objective;

c.       Whether the Fund's investments were overly concentrated in certain securities;

d.       Whether the Fund's acts as alleged herein violated the ICA;

e.       Whether the non-Fund defendants caused the Funds to violate the ICA;

f.       Whether the members of the Class have sustained damages, and, if so, what is the proper measure thereof.

51.       A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I
### VIOLATIONS OF SECTION 13(a) OF THE INVESTMENT COMPANY ACT
### (Against all Defendants)

52.       Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs as if set forth fully herein.  This Count is asserted on behalf of members of the Class for violation of § 13(a) of the ICA, 15 U.S.C. § 80a-13(a).

53.       The Defendants' conduct, as described above, deviated from the Fund's investment policy that was changeable only by a shareholder vote, and a deviation from a policy

recited in the Funds' Registration Statement as a "fundamental investment policy" in that, as detailed above, the Fund failed to engage in a strategy that would "preserve capital."

54.     Moreover, contrary to the Fund's stated policies, the Fund concentrated more than 25% of its total assets in high-risk mortgage-backed securities, utilized substantial and risky leveraging devices that resulted in borrowings well in excess of 33 1/3% of the value of its total assets, heavily employed risky total-return swaps and credit-default swaps, and otherwise invested in securities with undue risk.

55.     The above-noted investments made in violation of a stated fundamental investment policy caused significant losses to the Fund's shareholders, as alleged above. As described above, Plaintiffs and other members of the Class have suffered substantial damages in connection with losses in the Funds' value that resulted from the Funds' deviation from their stated fundament investment policy.

## COUNT II
## VIOLATION OF SECTION 36(b) OF THE INVESTMENT COMPANY ACT
### (Against Defendants OppenheimerFunds, Inc. and Oppenheimer Funds Distributor, Inc.)

56.     Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein.

57.     The Fund is a registered investment company within the meaning of the ICA.

58.     Defendant Oppenheimer Funds Distributor, Inc. is an affiliate of the Fund for purposes of Section 36(b) of the ICA.

59.     Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment advisor of a mutual fund owes to the mutual fund the fiduciary duties of loyalty, candor, and due care with respect to the receipt of compensation for services or payments of a material nature paid by the mutual fund to such investment advisor or affiliated person.  Those fiduciary duties

apply not only to the terms of the fee and compensation agreements, but also to the manner in which the investment advisor seeks approval of such agreements.

60.     Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), Defendant OppenheimerFunds, Inc., owes and owed to the Fund, the fiduciary duties of loyalty, candor, and due care with respect to its receipt of compensation for services or payments of any material nature paid by the Fund or its shareholders to Defendant OppenheimerFunds, Inc. as the investment advisor, or Defendant Oppenheimer Funds Distributor, Inc., its affiliate.  Those fiduciary duties include, but are not limited to, the duty of the advisor to seek approval of any advisory agreement upon full disclosure of all information material to the Fund Trustees decision regarding the compensation of Defendants OppenheimerFunds, Inc. and Oppenheimer Funds Distributor, Inc.

61.     Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment advisor of a mutual fund owes to the mutual fund the affirmative duty to furnish the trustees of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as an investment Adviser of such [mutual fund] company."

62.     Thus, among other things, Section 36(b) of the ICA prohibits and prohibited Defendant OppenheimerFunds, Inc. from soliciting the approval of any advisory agreement from the Fund or the Fund Trustees of the Board by use of false or misleading information, or by failing to disclose information material to the Trustees' decision regarding the adviser's compensation.  Information concerning conflicts of interest as well as the nature and extent of speculative, high-risk investment of the Fund's assets are and were particularly important to the Funds and to their Trustees.

63.     Defendants OppenheimerFunds, Inc. and Oppenheimer Funds Distributor, Inc. did not make full and fair disclosure of all information that would be material to the Trustees' decision regarding fees and any other compensation under advisory or other agreements.

64.     Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), a mutual fund shareholder may bring a civil action against an investment advisor or any affiliated person who has breached his or her fiduciary duties concerning such compensation and other payments.

65.     Defendants OppenheimerFunds, Inc. and Oppenheimer Funds Distributor, Inc. breached their fiduciary duty to the Fund by the acts alleged in this complaint, including but without limitation, engaging in speculative, high-risk investments in derivative investments in excess of the allowed 25%, and utilizing substantial and risky leveraging devices that resulted in borrowings well in excess of 33 1/3% of the value of its total assets.  Both were in violation of the stated policies of the Fund.  These actions were designed to maximize their own fees and compensation.

66.     As alleged herein, Defendants OppenheimerFunds, Inc. and Oppenheimer Funds Distributor, Inc. breached their fiduciary duties with respect to the receipt of compensation for services or other payments of a material nature from the Fund or their shareholders and by virtue have violated Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b).

67.     As a direct and proximate result of the wrongful conduct alleged above, the Fund was harmed by, among other things, the payment of compensation and fees which reduced the assets and value of the Fund, for which Defendants OppenheimerFunds, Inc. and Oppenheimer Funds Distributor, Inc. are liable.

## COUNT III
## BREACH OF FIDUCIARY DUTY
## (Against all Defendants)

68.     Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein.

69.     Defendants are fiduciaries to their investors.

70.     Defendants caused the Fund to violate of two fundamental policies—that the Fund could only invest 25% of its total assets in high-risk mortgage-backed securities, and that the Fund could not borrow in excess of 33 1/3% of the value of its total assets.

71.     Defendants' conduct constitutes a breach of fiduciary duty to the Class.

## COUNT IV
## BREACH OF CONTRACT
## (Against OppenheimerFunds, Inc.)

72.     Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein.

73.     By failing to manage the Fund in conformity with its stated investment objectives, OppenheimerFunds, Inc. breached its contract.   The direct and foreseeable consequence of this breach was an injury to those Fund investors who had not sought redemption of their shares prior to December 9, 2008.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.  Determining that this action is a proper class action and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.  Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.  Entry of such orders or judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of unlawful business acts and practices;

E.  Awarding recessionary relief; and

F.  Such equitable, injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: April 10, 2009

s/ Jeffrey S. Nobel
Jeffrey S. Nobel
Nancy A. Kulesa
**IZARD NOBEL LLP**
29 South Main Street, Suite 215
West Hartford, CT 06107
Tele: (860) 493-6292
FAX: (860) 493-6290
Email: jnobel@izardnobel.com

*Attorney for Plaintiffs*